IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICROSOFT CORPORATION, HEWLETT-PACKARD COMPANY, NETGEAR, INC., <br><br> Plaintiffs, <br><br> v. <br><br> COMMONWEALTH SCIENTIFIC AND INDUSTRIAL RESEARCH ORGANISATION, <br><br> Defendant. | No. C-05-1894 MJJ <br><br> **ORDER DENYING DEFENDANT'S MOTION TO DISMISS** |

## INTRODUCTION

Before the Court is Defendant Commonwealth Scientific and Industrial Research Organisation's ("Defendant" or "CSIRO") motion to dismiss Plaintiffs Microsoft Corporation, Hewlett-Packard Company, and Netgear, Inc.'s (collectively, "Plaintiffs") Complaint for Declaratory Judgment.[1] Defendant contends that Plaintiffs' claims should be dismissed, pursuant to Federal Rule of Civil Procedure 12(b)(1), for lack of subject matter jurisdiction. Defendant also contends that the action should be dismissed because Plaintiffs failed to adequately plead jurisdiction over Defendant CSIRO, an agency of a foreign government which is immune from suit pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602–1611, unless an exception to that immunity applies.[2] Finally, Defendant argues that Plaintiffs' action should be dismissed because it was filed for the improper purpose of disrupting ongoing litigation between CSIRO and Buffalo Technology (USA), Inc. and Buffalo, Inc. in the Eastern District of Texas. For the reasons set forth below, the Court **DENIES** Defendant's motion.

## FACTUAL BACKGROUND

---

[1] Apple Computer, Inc. is also named as a Plaintiff in the Complaint but voluntarily dismissed itself as a Plaintiff. Thus, this motion only contemplates the viability of the claims brought by Microsoft, Hewlett-Packard, and Netgear.

[2] Defendant also purports to bring its motion to dismiss under Rule 12(b)(2) of the Federal Rules of Civil Procedure but does not mention Rule 12(b)(2) anywhere in the text of its brief. Accordingly, the Court does not address any Rule 12(b)(2) motion here.

1  Defendant CSIRO is Australia's national science agency – an arm of the Australian
2  government. CSIRO is the assignee of United States Patent No. 5,487,069 (the "'069 patent"),
3  entitled "Wireless LAN." According to CSIRO, the patent covers the Institute of Electrical and
4  Electronics Engineers ("IEEE") 802.11a and 802.11g standards for wireless local area networks.
5  (*See* Denis Redfern Declaration ("Redfern Decl."), Ex. 7 at 6.)

6  In April 2003, CSIRO initiated licensing negotiations regarding the '069 patent with Plaintiff
7  Hewlett-Packard Company ("HP"). CSIRO informed HP that some of HP's products, such as the
8  Compaq Presario 2500 Series notebook with integrated 54G wireless is covered by the patent.
9  CSIRO suggested that repeatedly throughout the next year that HP take a license to the patent.
10 According to Plaintiffs, at one of the meetings between CSIRO and HP, CSIRO explained that
11 CSIRO would conduct a two-phase licensing program. During Phase One, CSIRO would ask
12 wireless networking product manufacturer to voluntarily license the patent. During Phase Two,
13 CSIRO would obtain payment from the entity involuntarily. At a May 10, 2004, meeting, CSIRO's
14 representative told HP, "we will sue you." (Declaration of Mikhail Lotvin ("Lotvin Decl."), ¶ 8.)
15 Defendant denies that threat was ever made. (*See* Declaration of Denis Redfern ("Redfern Decl."), ¶
16 8.) On June 21, 2004, CSIRO sent HP a formal offer to license the '069 patent. That offer was to
17 expire and did expire on December 18, 2004. In October 2004, CSIRO offered HP a covenant not to
18 sue in exchange for $2.5 million, which could serve as a credit toward any royalties owed if it was
19 determined, in a lawsuit with another alleged infringer, that CSIRO's patent indeed covered
20 technology incorporated into HP's products. The day before the 180-day period for accepting the
21 license was to expire, CSIRO informed HP, in writing, as follows:

> We are not threatening to bring any action against HP at this time. We do, however, want HP to understand (1) that upon the expiration of the offer period set forth in our formal license offer, our voluntary licensing program will be terminated with respect to HP, and (2) that a license under the CSIRO patent may not necessarily be available thereafter at any price.

25 (Redfern Decl., Ex. 47.) After the offer expired, Plaintiffs contend that CSIRO never requested
26 another meeting or initiated any further discussions with HP. In February 2005, CSIRO filed suit
27 against Buffalo.

28  In April 2003, CSIRO initiated licensing negotiations regarding the '069 patent with Plaintiff

2

Netgear, Inc. ("Netgear"). CSIRO informed Netgear that eight models of Netgear's wireless access points and wireless network interface cards that conform to the IEEE standards are supposedly covered by the '069 patent. CSIRO informed Netgear that a supplier of products conforming to the IEEE standards covered by the patent "probably directly infringes, induces and/or contributes to infringement" of various claims of the patent. CSIRO and Netgear met several times to discuss CSIRO's claims. During those meetings, CSIRO explained its two-phase licensing program, as it had with HP. During Phase One, CSIRO would ask wireless networking product manufacturer to voluntarily license the patent. During Phase Two, CSIRO would obtain payment from the entity involuntarily. On August 10, 2004, CSIRO presented a formal licensing offer to Netgear, explaining that after 180 days, the licenses under this Voluntary Licensing Program would not be available. That offer expired in February 2005. CSIRO never contacted Netgear after the offer expired.

In September 2003, CSIRO initiated licensing negotiations regarding the '069 patent with Plaintiff Microsoft Corporation ("Microsoft"). CSIRO informed Microsoft that Microsoft's wireless networking products that conform to the IEEE standards that are supposedly covered by the '069 patent "probably infringe[], induce and/or contribute[] to infringement" of various claims of the patent. CSIRO suggested that Microsoft accordingly needed a license from CSIRO. On September 20, 2004, CSIRO sent Microsoft a formal offer to license the '069 patent to Microsoft, explaining that after 180 days, the licenses would not be available. The offer was to expire and did expire on March 26, 2005. CSIRO never contacted Microsoft after the offer expired.

CSIRO's "Strategic Plan for 2003–2007," which is publicly available on CSIRO's website, states that CSIRO intends "aggressively to pursue possible infringement or assertion actions" to enforce its patents, including CSIRO's "wireless local area networking IP."

According to Defendant CSIRO, the licensing negotiations with all Plaintiffs were cordial and were never terminated, and CSIRO never threatened to bring suit against Microsoft, HP, or Netgear for patent infringement. According to Plaintiffs, through the discussions with CSIRO, it was always clear that if they rejected the license offers, CSIRO would initiate its second phase and begin litigating. They claim that they were particularly apprehensive of suit in light of CSIRO's publicly-available strategic plan and CSIRO's filing of a lawsuit for patent infringement against

3

1  Buffalo Technology (USA), Inc. and Buffalo, Inc. (hereinafter, "Buffalo") in February 2005.

2  Plaintiffs filed their Complaint for Declaratory Judgment ("Complaint") against Defendant
3  CSIRO on May 9, 2005.  Defendant now seeks to have that Complaint dismissed for lack of subject
4  matter jurisdiction.

## LEGAL STANDARD

### A.     Rule 12(b)(1) - Subject Matter Jurisdiction

Pursuant to Rule 12(b)(1), "a district court must dismiss an action if it lacks jurisdiction over the subject matter of the suit." *Friends of Frederick Seig Grove #94 v. Sonoma County Water Agency*, 124 F. Supp. 2d 1161, 1164 (N.D. Cal. 2000).  A case must "present a case or controversy under Article III, § 2, of the Constitution" in order to be subject to federal jurisdiction. *Spencer v. Kemna*, 523 U.S. 1, 7 (1998).  Thus, a case is moot if there is no "present controversy as to which effective relief can be granted." *American Casualty Company of Reading, Pennsylvania v. Baker*, 22 F.3d 880, 896 (9th Cir. 1984).  Accordingly, "[i]f it appears that [the court is] without power to grant the relief requested, then [the] case is moot." *Picrin-Peron v. Rison*, 930 F.2d 773, 775 (9th Cir. 1991).  The plaintiff has the burden of proving jurisdiction. *Tosco Corp. v. Communities for a Better Environment*, 236 F.3d 495, 599 (9th Cir. 2001).  Where a Rule 12(b)(1) motion denies or controverts jurisdictional allegations, the facts "underlying the controverted jurisdictional allegations are in dispute and are subject to fact finding by the district court." *Cedars-Sinai Medical Ctr. v. Watkins*, 11 F.3d 1573, 1584 (Fed. Cir. 1993).

In the context of a patent declaratory judgment action, Federal Circuit law governs the question of whether there is an actual case or controversy. *Goodyear Tire & Rubber Co. v. Realeasomers, Inc.*, 824 F.2d 953, 955 n.3 (Fed. Cir. 1987).  To make that determination, the Federal Circuit employs an objective test, which looks at the conduct of both the plaintiff and the defendant:

> First, the defendant's conduct must have created on the part of the plaintiff a reasonable apprehension that the defendant will initiate suit if the plaintiff continues the allegedly infringing activity.  Second, the plaintiff must actually have either produced the device or have prepared to produce that device.

*Arrowhead Industrial Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 736 (Fed. Cir. 1988) (quoting *Goodyear*, 824 F.2d at 955) (emphasis added).  In *Arrowhead*, the court distilled the test down to

4

1  two "core elements:" "(1) acts of defendant indicating an intent to enforce its patent; and (2) acts of
2  plaintiff that might subject it or its customers to suit for patent infringement." 846 F.2d at 737; *see*
3  *also Teva Pharmaceuticals USA Inc. v. Pfizer Inc.*, 395 F.3d 1324, 1332 (Fed. Cir. 2005). Article III
4  "mandate[s] that the injury in fact be 'concrete,' and 'actual or imminent, not conjectural or
5  hypothetical.'" *Teva*, 395 F.3d at 1333 (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83,
6  101 (1998)).

**B.     The Foreign Sovereign Immunities Act**

Foreign states are "presumed to be immune from the jurisdiction of the United States courts unless one of the [FSIA's] exceptions to immunity applies." *Moore v. United Kingdom*, 384 F.3d 1079, 1082 (9th Cir. 2004). The exceptions to the FSIA are commonly known as the waiver exception, § 1605(a)(1), the commercial activity exception, § 1605(a)(2), the immovable property exception, § 1605 (a)(4), and the tortious activity exception, § 1605(a)(5). The § 1605(a)(2) commercial activity exception to the FSIA "denies immunity in any case in which the action is based upon a commercial activity carried on in the United States by the foreign state." *Joseph v. Office of Consulate General of Nigeria*, 830 F.2d 1018, 1023 (9th Cir. 1987). "In determining whether the commercial activity exception applies, the courts focus only on those specific acts that form the basis of the suit." *Id*. "That is, the courts examine whether the particular conduct giving rise to the claim in question actually constitutes or is in connection with commercial activity, regardless of the defendant's generally commercial or governmental character." *Id*.

///
///

**ANALYSIS**

**I.     Case or Controversy**

In the patent context, the effect of the Declaratory Judgment Act, 28 U.S.C. § 2201, has been protection of competitors "victimized" by patent owners who "guerilla-like, . . . attempt extra-judicial patent enforcement with scare-the-customer-and-run tactics that infect the competitive environment of the business community with uncertainty and insecurity." *Arrowhead Industrial Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 735 (Fed. Cir. 1988) (citation omitted). Before the

5

Act was passed, competitors were often "rendered helpless and immobile so long as the patent owner refused to grasp the nettle and sue." *Id*. "After the Act, those competitors were no longer restricted to an *in terrorem* choice between the incurrence of a growing potential liability for patent infringement and abandonment of their enterprises; they could clear the air by suing for a judgment that would settle the conflict of interests." *Id*. "The sole requirement for jurisdiction under the Act is that the conflict be real and immediate, i.e., that there be a true, actual 'controversy.'" *Id*. (citing *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239–41 (1937).

Here, Defendant CSIRO contends that there is no case or controversy as between CSIRO and Plaintiffs Microsoft, HP, and Netgear because the first prong of the jurisdictional case or controversy test is not satisfied. That is, according to Defendant, CSIRO did not engage in conduct that created a reasonable apprehension of suit on Plaintiffs' part. Therefore, Defendant argues, the Court lacks subject matter jurisdiction.

With respect to whether Plaintiffs' action presents an actual case or controversy, the parties only disagree about whether the first prong of the Federal Circuit's two-part test is met. Plaintiffs contend that Defendant CSIRO's conduct in the context of license negotiations created in Plaintiffs an objectively reasonable apprehension of a lawsuit. Defendant disagrees and argues that because CSIRO never threatened to sue Plaintiffs and because none of the Plaintiffs ever broke-off the entirely cordial negotiations or affirmatively rejected CSIRO's offers, Plaintiffs' apprehension of a lawsuit on the basis of those discussions was not objectively reasonable and no case or controversy has yet arisen. The Court agrees with Plaintiffs.

At the outset, the Court rejects Defendant's argument that there is no reasonable apprehension of suit because CSIRO never expressly threatened to sue. The Federal Circuit has held that "[t]o put a putative infringer in reasonable apprehension of suit does not require an express charge of infringement and threat of suit; rather, such apprehension may be induced by subtler conduct if that conduct rises 'to a level sufficient to indicate an intent [on the part of the patentee] to enforce its patent,' i.e., to initiate an infringement action." *EMC Corp. v. Norand Corp.*, 89 F.3d 807, 811 (Fed. Cir. 1996). That Defendant CSIRO did not expressly threaten to sue Plaintiffs Microsoft, HP, or Netgear if they rejected CSIRO's license offers is not dispositive on the question

6

of whether CSIRO's conduct created a reasonable apprehension of suit. The Court now turns to the license negotiations and whether CSIRO's conduct in that context would objectively create a reasonable apprehension of suit.

CSIRO was engaged in lengthy licensing negotiations with Plaintiffs. CSIRO tendered formal offers to HP in June 2004, to Netgear in August 2004, and to Microsoft in September 2004. It is not disputed that the license negotiations between CSIRO and all Plaintiffs were passably cordial and were never expressly broken off. Accordingly, Defendant argues, the "safe harbor rule" for license negotiations applies. "When there are proposed or ongoing license negotiations, a litigation controversy normally does not arise until the negotiations have broken down." *Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha*, 57 F.3d 1051, 1053 (Fed. Cir. 1995); *EMC*, 89 F.3d at 811. Here, however, the Court finds that license negotiations were *not* ongoing when the instant declaratory judgment action was filed. Although the negotiations were not rancorous and although Plaintiffs did not affirmatively terminate the negotiations by expressly rejecting CSIRO's offers, the license offers expired with no response from Plaintiffs and before Plaintiffs filed the instant action. CSIRO had made it clear to each Plaintiff that should it decline to enter into a license agreement with CSIRO, it would initiate the second phase in its two-phase licensing program – litigation. Indeed, once the offers expired, CSIRO made no effort to continue negotiating with any of Plaintiffs. Once the offer had expired, it was objectively reasonable, based on prior communications from CSIRO, for Plaintiffs to be apprehensive that CSIRO would bring a patent infringement lawsuit. The evidence demonstrates that this is particularly true for HP who was explicitly told by a CSIRO representative that CSIRO would sue if HP rejected the license offer.

In *Electronics for Imaging, Inc. v. Coyle*, 394 F.3d 1341, 1347 (9th Cir. 2005), the Ninth Circuit held that EFI, who manufactured and sold products that allegedly infringed Coyle's patent, was reasonably apprehensive that Coyle, the patentee, would bring suit *even where the deadline for negotiations to be concluded between the parties had not yet passed*. In the instant case, negotiations *had* terminated, an even stronger case for finding that the plaintiff was reasonably apprehensive of a lawsuit. Although it is true that Coyle's threats to litigate were more explicit, and more impassioned in *Electronics for Imaging* than CSIRO's were here, what is clear from that case

7

is that ongoing license negotiations, depending on the facts of the case, does not necessarily "deprive [the declaratory plaintiff] of the right to sue." *Electronics for Imaging*, 394 F.3d at 1347.

Defendant CSIRO argues that there is no indication that the termination of the license offers that were tendered to Plaintiffs meant the end of all license negotiations between the parties. Defendant suggests that just because *that* offer terminated did not mean it was reasonable to anticipate that CSIRO would soon bring suit. The Court disagrees. In describing its licensing program to Plaintiffs, CSIRO clearly indicated that if Plaintiffs did not accept the license offers, those licenses would no longer be available at any price and CSIRO would enter phase two – litigation – of its two-phase licensing program. Accordingly, the Court finds that it was objectively reasonable for Plaintiffs to be apprehensive, once the license offers had expired, that CSIRO would soon bring suit.

This case is distinguishable from the *Phillips Plastics* case on which Defendant relies. In *Phillips Plastics*, the Federal Circuit agreed with the district court that there was no case or controversy (and thus, no subject matter jurisdiction) where license negotiations between the parties were at such an early stage that licensing terms had not been discussed, and where the declaratory plaintiff filed suit before even responding to the patentee's request for sales and pricing information (to "put together a reasonable offer of a licensing proposal"). 57 F.3d 1052. Here, the license negotiations were much further along than in *Phillips Plastics*. CSIRO had extended formal offers with clear terms and had clearly indicated that litigation would be the next step if Plaintiffs rejected the license offers. Indeed, the offers had already expired when Plaintiffs brought suit. Even though it might have been (and might still be) possible to revive negotiations, negotiations were not ongoing at the time this action was filed. The expiration of CSIRO's offers, along with CSIRO's none-too-subtle suggestion that it would initiate litigation if Plaintiffs declined to enter into a license agreement, support a finding that Plaintiffs' apprehension of suit was objectively reasonable. The *Phillips Plastics* holding, that a case or controversy does not arise where license negotiations are ongoing, does not apply here.

Additionally, the Court agrees that CSIRO's lawsuit against Buffalo for infringement of the '069 patent contributed to Plaintiffs' apprehension of a lawsuit. Defendant contends that the Buffalo

8

situation is distinguishable from the instant factual backdrop such that that wholly separate lawsuit would not reasonably lead Plaintiffs to anticipate a similar lawsuit. In the Buffalo case, CSIRO had initiated license negotiations with Buffalo which were not warmly received. Unlike Plaintiffs, Buffalo refused to meet with CSIRO and terminated the negotiations. (Redfern Decl., Exs. 24, 25.) CSIRO then brought suit against Buffalo. Here, none of the Plaintiffs cut short the license negotiations with CSIRO, but instead, never responded to the offers and let them expire. While the manner in which license negotiations ceased differs in the two cases, the Court finds that the Buffalo suit supports Plaintiffs' apprehension that CSIRO would bring a patent infringement suit against Plaintiffs in the event Plaintiffs declined the license offer. That Plaintiffs did not decline before the offers expired is a distinction without a difference. By bringing suit against Buffalo, CSIRO indicated its intent to bring suit against license offerees who declined to enter into a license agreement. The Buffalo suit would certainly intensify Plaintiffs' concerns that they would be sued once they had declined, either affirmatively or passively, CSIRO's license offers.

For these reasons, the Court finds that Plaintiffs were reasonably apprehensive that CSIRO would file a lawsuit against them for patent infringement. Thus, a case or controversy exists for purposes of establishing subject matter jurisdiction.

**II.     Foreign Sovereign Immunity**

Defendant CSIRO contends that even if the Court finds that Plaintiffs have demonstrated that there is a case or controversy here, jurisdiction does not lie because Plaintiffs have not properly pled jurisdiction over CSIRO, which is immune from suit pursuant to the Foreign Sovereign Immunities Act unless one of the FSIA's exceptions applies. Plaintiffs contend, to the contrary, that Defendant's licensing negotiations with each of them amount to relevant commercial activity such that the commercial activity exception, codified as 28 U.S.C. § 1605(a)(2), applies.

The FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act." *Joseph*, 830 F.2d at 1023 (citing 28 U.S.C. § 1603(d)). Court are to evaluate the nature rather than the purpose of the activity in question. *Id*. A state engages in commercial activity "where it exercises 'only those powers that can also be exercised by private citizens' as distinct from those 'powers peculiar to sovereigns.'" *Saudi Arabia v. Nelson*,

9

1  507 U.S. 349, 360 (1993) (citation omitted).  "Transactions . . . are covered by the commercial
2  activity exception if the role of the sovereign is one which might be played by a private actor" while
3  "[a]n activity is public and 'noncommercial' if it is one which only a sovereign state can perform."
4  *Joseph*, 830 F.2d at 1024.

5  Here, CSIRO initiated licensing negotiations for its U.S. patent with Plaintiffs Microsoft, HP,
6  and Netgear.  CSIRO's goal was to secure license agreements with Plaintiffs so that it would receive
7  royalties from Plaintiffs' products that incorporate the technology covered by the '069 patent.  This
8  is not an activity peculiar to a sovereign state, but is, instead, a commercial activity that a private
9  entity would engage in.  The Court has found no case that directly addresses whether a patent
10 holder's initiation and involvement in licensing negotiations over a U.S. patent constitutes
11 commercial activity that renders sovereign immunity inapplicable.  However, based on existing case
12 law on the exception, as described above, the Court is hard-pressed to see how CSIRO's conduct
13 could be characterized as anything but commercial activity.  Accordingly, the Court finds that
14 CSIRO is not immune from suit under the FSIA.[3]

15 **III.    Improper Purpose**

16 Defendant contends that the Court should decline discretionary jurisdiction over Plaintiffs'
17 declaratory judgment action because the action was brought for the improper and collusive purpose
18 of manipulating the judicial system and forum shopping.  As described more fully above, Plaintiffs
19 have demonstrated that they have a legitimate interest in resolving the conflict with CSIRO over
20 whether their products infringe the '069 patent.  If they were to continue to manufacture and sell
21 their allegedly infringing products, waiting for CSIRO to "grasp the nettle and sue," they would
22 open themselves up to increasing their potential liability for that alleged infringement.  This is the
23 very risk that the Declaratory Judgment Act was enacted to alleviate.  The Court does not find, on
24 this record, that Plaintiffs brought this action for an improper purpose.

25 **CONCLUSION**

---

[3] The Court notes that Plaintiffs failed to expressly plead that jurisdiction exists over CSIRO pursuant to the commercial activity exception to the FSIA codified at 28 U.S.C. § 1605(a)(2). However, formal amendment is not required where, as here, the jurisdictional basis is clear on the face of the Complaint.  *Nationwide Mut. Ins. Co. v. Liberatore*, 408 F.3d 1158, 1161–62 n.2 (9th Cir. 2005). Accordingly, Plaintiffs need not amend their Complaint.

For the foregoing reasons, Defendant's motion to dismiss is hereby **DENIED**.[4]

This Order terminates docket entry nos. 32 and 58.

**IT IS SO ORDERED.**

Dated: September_13__, 2005

MARTIN J. JENKINS
UNITED STATES DISTRICT JUDGE

---

[4] The Court **DENIES** Plaintiff HP's *ex parte* application for leave to submit supplemental declarations in support of its opposition to Defendant's motion to dismiss.